***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission affirms with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. On November 2, 1995, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. At such time, an employment relationship existed between plaintiff and employer-defendant.
3. On November 2, 1995, Riscorp National Insurance Company was the carrier on the risk for employer-defendant; Zenith Insurance Company has assumed responsibility as carrier-defendant for the original carrier-defendant Riscorp National Insurance Company.
4. On November 2, 1995, plaintiff suffered a compensable injury to his left leg and hip. Defendants filed a Form 19 and Form 63 and accepted the claim by paying indemnity and medical compensation beyond the statutory deadline for contesting the claim, as set forth in N.C. Gen. Stat. § 97-18(d).
5. Plaintiff's average weekly wage for the relevant time period was $593.60, which yields a compensation rate of $395.76.
6. All parties have been correctly designated, there is no question as to misjoinder of the parties, and the parties are subject to the jurisdiction of the North Carolina Industrial Commission.
7. The parties are in disagreement as to the degree of permanent partial impairment sustained by plaintiff as a result of the November 2, 1995 accident.
8. The following exhibits were stipulated into evidence:
a. Stipulated Exhibit Number 1 — Medical Documents
b. Plaintiff's Exhibit Number 1 — I.C. Form 19
c. Plaintiff's Exhibit Number 2 — Written Job Description for Telemarketing Position
d. Plaintiff's Exhibit Number 3 — Indemnity Information
e. Plaintiff's Exhibit Number 4 — Five I.C. Form 26s
f. Plaintiff's Exhibit Number 5 — List Prepared by Plaintiff Reflecting Amounts Received from March Construction
g. Plaintiff's Exhibit Number 6 — Photographs of Cysts on Left Leg Stump
h. Plaintiff's Exhibit Number 7 — Proposed Agreement for Final Compromise Settlement and Release
i. Plaintiff's Exhibit Number 8 — Correspondence from Employer to Plaintiff Regarding COBRA Coverage
j. Defendants' Exhibit Number 1 — Return to Work Note from Dr. J. Vance
9. The Pre-Trial Agreement dated March 31, 2003, which was submitted by the parties, is incorporated by reference.
10. The issue before the Commission is what additional compensation is plaintiff due, if any.
 ***********
Based upon all the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was forty-six years old at the time of the hearing before the Deputy Commissioner and has his GED. Plaintiff began working for defendants in the spring of 1995. Before plaintiff was hired by the company, he had worked for Petroleum Tank Service in Kentucky where he had been born and was then residing. When defendants hired plaintiff, he moved to North Carolina and maintained a residence in North Carolina until he was assigned to a job in Virginia. The job involved maintaining the equipment at a tank farm. Defendants provided lodging at a nearby motel for the workers at that job site.
2. Long before his employment with defendants, plaintiff's left leg was amputated below the knee. Except for some phantom pain, he had not reported any problems with the leg to Dr. Simpson, his family doctor in the six years he had been seeing the doctor prior to the compensable injury. Plaintiff had a prosthesis, which fit and functioned well, and he was able to work in jobs requiring manual labor.
3. On November 2, 1995 plaintiff sustained a compensable injury by accident when he lost his footing while stepping across several gas lines and he fell approximately three feet to the ground. As a result of the fall, plaintiff sustained a fracture to the femoral condyle of his left knee and injured his left hip.
4. Dr. Byrne examined plaintiff at Fairfax Hospital and recommended surgery.
5. On November 4, 1995 Dr. Byrne operated on plaintiff's knee to reduce and fixate the fracture using a metal plate. Following the operation, plaintiff was instructed not to bear weight on the leg, and on November 15, 1995 he was discharged.
6. Plaintiff then moved back into his mother's home in Kentucky and began receiving treatment by Dr. Vance, an orthopedic surgeon who had treated him when he originally underwent the amputation in 1976.
7. Despite physical therapy plaintiff could not regain the motion he had previously had in his left knee. By June 1996 Dr. Vance concluded that the remaining limitation of motion would likely be permanent since the fracture and surgery had caused the articular surface of the knee to be somewhat uneven so that the bones could not slide smoothly. Dr. Vance also expected arthritis to develop in that area.
8. In addition to the persistent pain and limitation of motion within the joint, plaintiff was also experiencing problems with his prosthesis. The fracture changed the physiology of plaintiff's knee and also changed his walking gait. Consequently, the prosthesis plaintiff had worn without difficulty before the accident would no longer fit properly.
9. Barry Canter, a prosthetic specialist, worked with plaintiff beginning in January 1996. Mr. Canter initially provided a stump shrinker and then a temporary prosthesis as the stump continued to change during the healing process.
10. On March 27, 1996, after plaintiff had complained of persistent pain in his left hip, films ordered by Dr. Vance revealed a small fracture of the ischial tuberosity, a part of the pelvis near the hip.
11. Dr. Vance released plaintiff to do part-time, light duty work beginning February 21, 1996 and plaintiff's employer assigned some telemarketing duties which he could do from his mother's house. However, on March 27, 1996 when the other fracture was identified, Dr. Vance took plaintiff out of work completely for a month.
12. Plaintiff was released again on April 26, 1996 and was restricted to four hours per day of light duty work. Those restrictions were not changed until July of 1996 when plaintiff's hours were increased to six hours per day.
13. Defendants admitted liability for benefits under the Workers' Compensation Act pursuant to a Form 63 which was never contested, and paid compensation to plaintiff for temporary total disability and temporary partial disability after his injury. The evidence of record did not reveal specifically the amount of compensation paid. Although the nature of the compensation paid was changed when plaintiff began working in a light duty capacity, defendants did not file a Form 62 notifying the Industrial Commission of the change nor did they file Form 28T's showing that plaintiff had started a trial return to work period.
14. Plaintiff was paid minimum wage for the part-time light duty work he performed and therefore earned significantly less than his former average weekly wage of $593.60.
15. In June 1996, Shellee Mason in defendant-employer's office, informed plaintiff that the company was discontinuing his telemarketing services. Plaintiff had previously been told that the telemarketing position was temporary so this information was not unexpected.
16. Despite the fact that plaintiff remained unable to perform his former job duties and no light-duty work was being offered, defendants terminated payment of compensation altogether on July 12, 1996 without filing a Form 24 request to stop payment or obtaining approval of the Industrial Commission. Defendants did not resume payment of compensation at any time prior to the date of hearing before Deputy Commissioner Chapman.
17. On August 21, 1996 Dr. Vance allowed plaintiff to return to work on a full time basis with no lifting of more than twenty pounds, no walking on uneven ground and no climbing of ladders. With those restrictions, plaintiff still could not perform his former job duties. His employer called plaintiff and suggested that he come back to North Carolina and defendant-employer would find him something else to do. No specific job was discussed at that time, but Ms. Mason subsequently indicated that plaintiff would be given a telemarketing job.
18. Defendants have contended that the telemarketing position was a real job within the company. However, in fact, the only previous telemarketing activities had been performed by Ms. Mason who made calls as she had time while performing her numerous other job duties. There was no telemarketing position within the company. Defendants were only willing to pay plaintiff minimum wage for the telemarketing position.
19. Plaintiff no longer had a place to live in North Carolina. The Commission finds it was unreasonable for the company to expect plaintiff to relocate to North Carolina from Kentucky in order to accept a minimum wage job which he had been told that was a temporary job was a "make work" job and which defendants had already previously withdrawn from him with no advance warning. To the extent that the job was actually offered, which is questionable from the evidence of record, plaintiff was justified in refusing the position, which was not suitable employment.
20. In October 1996, plaintiff began working on a "casual" basis for Marsh Construction Company (Marsh). Gary Marsh, the company president, knew that plaintiff had extensive experience in the past as superintendent of the city street department. Mr. Marsh hired plaintiff to work on special projects and to work when there was an overflow of projects. The jobs involved being at the construction sites and overseeing the completion of the projects. Although plaintiff was a supervisor, he also had to do some physical work and he had to be able to move about the construction site.
21. On October 23, 1996, shortly after plaintiff started to work for Marsh, he went to Dr. Vance with a reddened, painful mass on the stump of his injured leg. Defendants would not agree to pay for this treatment. By letter dated December 20, 1996 Dr. Vance explained to the carrier that the physiology of the knee and plaintiff's gait had been changed as a result of the fracture so that the dynamics between the stump and the prosthesis had also changed to cause the friction sore. The doctor wrote a letter again in February 1997 explaining the causal relationship between the fracture and the problems plaintiff was having with his stump.
22. By that time, plaintiff's work efforts had been noticeably impaired by the pain associated with the cysts on his stump. He began to have trouble getting around the construction sites, climbing steps and keeping up with the jobs. There were days when plaintiff could not put pressure on his prosthesis. In fact, he did not work at all from mid December 1996 until approximately mid February 1997.
23. By April 1997, Mr. Marsh decided that he could no longer have plaintiff doing work for the company since he needed to be able to count on plaintiff to keep up with the job. Both Mr. Marsh and Dr. Vance signed a Form 28U submitted by plaintiff requesting reinstatement of benefits due to an unsuccessful trial return to work period. Defendants, however, did not resume payment of compensation.
24. In April 1997 despite the notes and letter from Dr. Vance explaining that the problems plaintiff was experiencing were due to his injury at work, defendants stopped paying for his medical treatment.
25. Plaintiff subsequently underwent surgery to remove the plate which had been inserted in his knee after his fall at work. However, plaintiff continued to experience persistent and severe pain and to develop recurrent sores on his stump.
26. By August 1998 Dr. Vance was of the opinion that plaintiff would only be able to perform sedentary work.
27. In early 1999, plaintiff was referred to Dr. Valentini, a plastic surgeon, regarding the persistent sore on his stump.
28. Dr. Valentini examined plaintiff on February 1, 1999, diagnosed him with a subcutaneous cyst and recommended surgery.
29. Plaintiff's first operation was performed on February 8, 1999. Despite the surgery and subsequent treatment, plaintiff returned to the doctor repeatedly with problems associated with development of scar tissue or an ulceration of the scar. Dr. Valentini felt the cause of these conditions was pressure from his prosthesis. Dr. Valentini performed a second operation on June 7, 2000 to address constricting scar tissue and kept plaintiff out of his prosthesis for a period of time that summer to allow for better healing. Dr. Valentini repeatedly recommended that plaintiff be provided with a new prosthesis.
30. Due to the pain associated with this injury, plaintiff required narcotic pain medication. Both Dr. Vance, who saw plaintiff again in April 2003, and Dr. Valentini became concerned about the amount of pain medication he was using. Consequently, Dr. Valentini ultimately referred plaintiff to Dr. Dempsey, an anesthesiologist and pain management specialist, for evaluation. Dr. Dempsey examined plaintiff on April 2, 2003 and recommended trial of a morphine pump. The trial required that plaintiff discontinue his oral narcotic medication and undergo an epidural infusion of medication into his spine.
31. Consequently, on May 14, 2003 plaintiff was admitted to the hospital for the procedure. He reportedly obtained significant pain relief from it, so on May 21, 2003 a permanent pump was installed. These procedures were performed after the date of the hearing before Deputy Commissioner Chapman.
32. Because of the termination of benefits by defendants, plaintiff filed a Form 33 requesting for a hearing.
33. The Full Commission finds as a result of the injury by accident giving rise to this claim, plaintiff was unable to work in any capacity from November 3, 1995 until the date after February 21, 1996 when he was given light work duties by defendants. Plaintiff subsequently became unable to work on March 27, 1996 and remained so disabled through April 26, 1996. During the periods of partial disability between February and June 1996 when plaintiff was able to do light work and his employer provided suitable light work, he was unable to earn his regular wages.
34. On the unknown date in June 1996 when the light duty work was withdrawn, plaintiff remained significantly disabled and was unable to return to work in his former job. At no time thereafter did defendants offer him suitable light work. The telemarketing job, if actually offered to plaintiff, was make-work and therefore is not suitable employment. Any offer of a telemarketing position in North Carolina in August 1996 was unreasonable under the circumstances in view of the fact that plaintiff would have had to relocate to North Carolina, the job only paid minimum wage and his employer had previously withdrawn the same type job without notice.
35. In addition, plaintiff had not reached maximum medical improvement in August 1996. His condition worsened sufficiently upon his attempt to return to work in October 1996 that he required additional medical treatment. The recurrent sores, cysts and scar tissue which developed on his stump and which required ongoing treatment thereafter were a proximate result of his November 2, 1995 injury by accident which altered the anatomy of his stump and changed his gait due to the residual limitation of motion of the knee from the fracture.
36. The Commission finds that the medical treatment plaintiff received from Dr. Vance, Dr. Valentini and Dr. Dempsey was reasonably necessary to effect a cure, give him relief and lessen his disability from the injury giving rise to this claim.
37. Plaintiff was unable to work in any capacity from June 1996 until October 1996 when he began working on and off for Marsh. Between October 1, 1996 and December 16, 1996, plaintiff earned a total of $4,478.42 and was therefore able to earn an average of $407.13 per week, which was less than his former average weekly wage with defendants. Plaintiff was then unable to work in any capacity due to the increased symptoms from his injury until approximately February 18, 1997. Between approximately February 18, 1997 and April 28, 1997, plaintiff earned a total of $2,483.27 and therefore was able to earn an average of $248.33 per week.
38. After April 28, 1997 plaintiff was unable to earn wages in consistent and steady employment. Mr. Marsh occasionally hired plaintiff to run an errand or to do an odd job, but the evidence of record is not sufficient to disclose the amount of plaintiff's earnings or when they were paid.
39. As of the date of the hearing before Deputy Commissioner Chapman, plaintiff had not reached maximum medical improvement. He was under treatment by Dr. Dempsey for chronic pain associated with his injury and remained unable to work at that time.
40. Defendants contested their liability for treatment for the problems plaintiff experienced with his stump and with his prosthesis after August 1996. The amputation of plaintiff's leg occurred long before the injury in question and his need for a prosthesis was not in any way related to this injury. However, the fractures sustained in plaintiff's fall at work damaged the left knee and led to changes of the tissues of the stump and of his walking gait so that he was required to go through the complete fitting process for a prosthesis just as though the amputation had been recent. The medical evidence indicated that it takes several years for a stump to shrink to its final form. In the meantime, the patient must go through four to five sockets and several prostheses. Since defendants refused to accept responsibility for the need for prosthetic changes, plaintiff experienced sores, cysts and scar tissue problems associated with excessive friction from a poorly fitting prosthesis. Plaintiff now requires the prosthetic changes which should have been done in years past. However, once the stump stabilizes and a properly fitting prosthesis is provided, defendants will have at that time provided the prosthetic treatment associated with this injury.
41. Plaintiff claimed that he developed depression as a result of this injury so that he required medical treatment. Dr. Simpson, plaintiff's family doctor, treated him with medication for depression. Although Dr. Simpson acknowledged that chronic pain could cause depression, Dr. Simpson refused to make a casual relationship between plaintiff's injury by accident and plaintiff's depression. It appeared that there were factors unrelated to the injury in question which could have led to the depressive condition at issue. Plaintiff has not met his burden to prove that his depression was a proximate result of his injury at work.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On November 2, 1995 plaintiff sustained an injury by accident arising out of and in the course of his employment with defendants. N.C. Gen. Stat. § 97-2(6).
2. As the result of his compensable injury, plaintiff is entitled to compensation for temporary total disability at the rate of $395.76 per week for the following periods: from November 3, 1995 until he returned to work in February 1996; from March 27 through April 26, 1996; from the date his light duty work was terminated in June 1996 through September 30, 1996; from December 17, 1996 through February 17, 1997; from April 29, 1997 through the date of hearing on April 8, 2003 and continuing thereafter until he returns to work or until further order of the Industrial Commission. However, defendants are entitled to a credit for compensation previously paid for these periods. N.C. Gen. Stat. §§ 97-29; 97-42.
3. Plaintiff is entitled to compensation for temporary partial disability at the rate of two-thirds of the difference between his former average weekly wage of $593.60 and his weekly earnings from the date he returned to work in February 1996 until March 26, 1996 and from April 27, 1996 until his light duty work was terminated in June 1996. Defendants are entitled to a credit for compensation previously paid during these periods. N.C. Gen. Stat. §§ 97-30; 97-42.
4. Plaintiff is entitled to compensation for temporary partial disability at the rate of $124.32 per week for eleven weeks, for the period from October 1 through December 16, 1996, and at the rate of $230.18 per week for ten weeks, for the period from February 18 through April 28, 1997. N.C. Gen. Stat. § 97-30.
5. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident, including past and necessary future treatment rendered by Dr. Vance, Dr. Valentini and by Dr. Dempsey. In addition, plaintiff is entitled to have defendants provide the necessary changes and replacements to his prosthesis until such time as his stump is stable and he has a properly fitting prosthesis. However, he is not entitled to have defendants provide treatment for his depression. N.C. Gen. Stat. §§ 97-2(19); 97-25.
6. Plaintiff is entitled to have a ten percent penalty assessed against defendants for all compensation due after July 12, 1996 which was not paid on a timely basis since defendants admitted liability for this claim, since they did not seek or obtain permission from the Industrial Commission to stop payment of compensation, and since compensation remained due at all times after that date. N.C. Gen. Stat. §§ 97-18; 97-18.1.
7. In that defendants stopped payment of compensation without complying with the law or Industrial Commission rules, in that they failed to file Forms 62 and Forms 28T when plaintiff returned to light work, contrary to law, in that they failed to reinstate compensation upon receipt of the properly executed Form 28U, and in that the pattern of disregarding the law was egregious in this case, significant sanctions should be assessed against defendants. N.C. Gen. Stat. §§ 97-18; 97-18.1; 97-31.1; Rules 404, 404A and 802, Workers' Compensation Rules of the North Carolina Industrial Commission.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay compensation to plaintiff for temporary partial disability at the rate of two-thirds of the difference between his former average weekly wage of $593.60 and his weekly earnings from the date he returned to work in February 1996 until March 26, 1996 and from April 27, 1996 until his light duty work was terminated in June 1996, subject to a credit for compensation previously paid by defendants for those periods. Defendants shall also pay him compensation for temporary partial disability at the rate of $124.72 per week for eleven weeks and at the rate of $230.18 per week for ten weeks. Defendants shall pay a 10% penalty for late payment for the compensation due after July 12, 1996 directly to plaintiff. This compensation has accrued and shall be paid in a lump sum subject to the attorney's fee approved below.
2. Defendants shall pay compensation for temporary total disability to plaintiff at the rate of $395.76 per week for the periods from November 3, 1995 until he returned to work in February 1996; from March 27 through April 26, 1996; from the date his light duty work was terminated in June 1996 through September 30, 1996; from December 17, 1996 through February 17, 1997; from April 27, 1997 through the date of hearing before Deputy Commissioner Chapman on April 8, 2003 and continuing thereafter until he returns to work or until further order of the Industrial Commission. This award is subject to a credit for the compensation previously paid until July 12, 1996. However, defendants shall pay plaintiff a 10% penalty for late payment for the compensation owed after July 12, 1996 which was not paid on a timely basis. That portion of this compensation which has accrued shall be paid in a lump sum. This award is subject to the attorney's fee approved below.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident, including those arising from past and necessary future treatment by Dr. Vance, Dr. Valentini and Dr. Dempsey and including prosthetic adjustments, changes and replacements until plaintiff's stump stabilizes and he has a properly fitting prosthesis. The evidence did not disclose the source of payment for the treatment rendered after defendants stopped providing medical treatment in this case, but this award is for the entire cost of the treatment, subject to the fee schedule, and it is the intent of this decision that any third party payors be reimbursed by defendants.
4. An attorney's fee in the amount of 25% of the net compensation and penalties awarded is approved for plaintiff's counsel. Defendants shall pay him a lump sum from the accrued compensation and shall pay him every fourth check of continuing compensation.
5. Defendants shall pay the costs including sanctions to the Industrial Commission pursuant to Rule 802 in the amount of $5,000.00.
6. Plaintiff's motion for an order of payment pending appeal pursuant to N.C. Gen. Stat. § 97-86.1 is premature and is DENIED at this time.
This the 19th day of July 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER
LKM/mb